# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**DWAYNE BROOKS,**

       **Plaintiff,**

       **v.**

**THE CITY OF CLEVELAND, *et al.*,**

       **Defendants.**

)
)
)
)
)
)
)
)
)
)
)

**CASE NO: 1:24-cv-1590**

**Judge Dan Aaron Polster**

**OPINION AND ORDER**

Before the Court is Defendant City of Cleveland's (the "City") Motion for Judgment on the Pleadings ("City's Motion"), ECF 28, and the Individual Defendants[1] Partial Motion for Judgment on the Pleadings ("Individual Defendants' Motion"), ECF 29.

For the following reasons, the Court: (1) **DENIES** the City's Motion; (2) **GRANTS IN PART** the Individual Defendants' Motion as it relates to any federal and state law claims for monetary judgment against the Tolliver Estate, as well as the abuse of process claim against all Individual Defendants; and (3) **DENIES IN PART** the Individual Defendants' Motion regarding any federal and state law claims for declaratory judgment against the Tolliver Estate, as well as the remaining state law claims against the Individual Defendants.

---

[1] The Individual Defendants are, collectively: Edward Kovacic, Gregory Kunz, James Cudo, Jack Bornfield, and Dennis Murphy, John James, John Fransen, the Estate of John Kaminski, and the Estate of Robert Tolliver. Officer Kaminski was alive had the time the Complaint was initially filed in November 2024; he has since passed away and has been substituted in this matter by his Estate. *See* ECF 47.

1

## I.  BACKGROUND

### A.  Factual Background[2]

#### 1.  Background to the Murder

On the evening of August 17, 1987, four or five men in a stolen van drove to Luke Easter Park on Cleveland's east side and fired multiple gunshots into a crowd, killing Clinton Arnold and wounding two others. ECF 5, ¶ 7. Survivors of the shooting saw the perpetrators drive away. *Id*. Dwayne Brooks ("Brooks" or "Plaintiff") was not present at the scene of the crime, because he was in New York visiting family. *Id*., ¶ 8.

Members of the Cleveland Division of Police ("CDP") first arrived at the crime scene after the shooting was over. Detectives authored the original investigation report, opening the police investigation of the Clinton Arnold murder. *Id.*, ¶ 9.

#### 2.  Pre-Indictment Investigation

Defendants Detectives Kovacic, Kunz, and Cudo of the homicide division led the investigation, with assistance from Defendants Bornfield and Murphy. *Id.*, ¶ 10. The Supervisor Defendants, James, Kaminski, Fransen, and Tolliver, oversaw the investigation. *Id.*, ¶ 11 Supervisor Defendant Lieutenant John James administered the homicide division of the police department, and personally assigned officers in the Clinton Arnold investigation. *Id.* The Supervisor Defendants, particularly Fransen and James, also personally performed investigative work on the case. *Id.* All four Supervisor Defendants reviewed, approved, and signed off on all reports of officer misconduct described in the Complaint. *Id.* The Supervisor Defendants had reason to know about all the information relevant to the investigation, including suppressed

---

[2] The Court must take all properly alleged facts as true, construing them in the light most favorable to the plaintiff. *See infra* at Section II.

evidence. *Id.*

The Individual Defendants developed most of what would become the State's case against Brooks during August and September of 1987. *Id.*, ¶ 12. They also developed cases against two other suspects—Sam Philpot and Kelly Wingo—leaving at least one other participant that remains unknown. *Id.*

During the investigation, Defendants took photos of the scene and gathered physical evidence, including the victim's body, the stolen van and its contents, and bullet casings and pellets found at the scene. *Id.*, ¶ 13. The Police Scientific Investigation Unit ("SIU") conducted forensic testing at the scene. *Id.* Defendants and SIU did not find ballistics, fingerprint, blood, or any other physical evidence that showed Plaintiff was present at the scene of the crime. *Id.* The investigation proceeded solely on witness statements. *Id.*, ¶ 15.

Based on various witness accounts, the Individual Defendants began constructing a narrative of the events surrounding the August 17 shooting. *Id.*, ¶¶ 16-21. The key witnesses were people who were at the park during the shooting, people who had witnessed the preceding van robbery or suspects getting into the van before the shooting, and people who had seen the perpetrators leave the van after the shooting. Additional witnesses included impartial neighborhood onlookers, victims of the robbery and shooting, and never-pursued alternate suspects in the crimes. *Id.* Defendants learned that two men stole the van at gunpoint from a man named Johnny Logan shortly before the shooting. *Id.*, ¶ 19. Others described seeing the shooters flee the van after firing into the crowd at Luke Easter Park. *Id.* Defendants learned that Brooks, Wingo, and Philpot had all been at the park a few days prior to the shooting, when a conflict arose between Wingo, Philpot, and a separate group of young men. *Id.*, ¶ 17. Defendants learned that, on the day of the shooting, the gunmen in the van were aiming at the same men from the earlier altercation,

3

but the shots struck bystanders instead, including Clinton Arnold. *Id.*, ¶ 18.

Beyond this information, witness statements varied significantly. *Id.*, ¶ 20. Some placed Brooks at the scene, while others identified only Wingo and Philpot, and not Brooks, at the scene. *Id.* Other witnesses put at least five completely different suspects at the scene. *Id.* Notably, no eyewitness placed Brooks at the scene of the van robbery. *Id.* Despite these conflicting accounts, the complaint alleges that two self-interested witnesses offered a version of events implicating Brooks in exchange for favorable treatment in their own criminal investigations. *Id.*, ¶ 21.

The Individual Defendants relied heavily on the witness testimony of Michael Creel, who, along with several relatives, was an initial suspect in the investigation. *Id.*, ¶ 22. Police arrested Creel and his cousins immediately after the shooting, and Defendants interviewed Creel multiple times. *Id.* While in custody, Creel gave a witness statement alleging that Brooks, Wingo, and Philpot arrived at his house shortly after the shooting and were "acting suspicious." *Id.* At the time of his statement, Creel had already been in implicated in the crime, as he was under arrest and the police found him in possession of items from inside the stolen van. *Id.* The Complaint alleges that Creel made this statement to protect himself and his family by redirecting suspicion toward Brooks. *Id.* The Defendants relied on Creel's statements for the rest of the investigation and throughout trial. *Id.*

The other key witness that the Individual Defendants relied on was Kelly Wingo. *Id.*, ¶ 23. Wingo voluntarily turned himself in, admitting involvement as a non-shooter in the incident. *Id.* He claimed Brooks was one of the shooters and that one of the guns used belong to Brooks. *Id.* In exchange for Wingo's cooperation, including this statement and later testimony at trial, Wingo was permitted to plead to lesser charges and a lighter sentence. *Id.* The Individual Defendants learned during their investigation that Wingo was under a separate FBI investigation for

international drug trafficking at the time of the incident. *Id.*, ¶ 27e. This important fact was documented by Defendants Kovacic and Cudo in at least one report, and by Defendants Fransen and James in at least one other report. *Id.* However, this information was not disclosed.

Separately, Philpot turned himself in and was convicted for his involvement in the incident. *Id.*, ¶ 24.

Relying on the statements of Wingo and Creel, the Individual Defendants abandoned their investigation into the Creel family and other potential suspects. *Id.*, ¶¶ 25-26. In order to support this narrative, the Individual Defendants "ceased to continue to investigate the Creels or other alternate suspects; abandoned a search for any fourth or fifth participants; and went after Brooks." *Id.* ¶ 25. The Individual Defendants "ignored and eventually suppressed witness statements that supported Brooks's [sic] non-involvement, impeached Wingo or Creel's stories, or pointed to different suspects." *Id.*, ¶ 26.

Brooks alleges that several exculpatory and impeaching witness statements were not disclosed during the investigation or trial. *Id.*, ¶ 27. One such witness, Sharon Garrett, who saw the four or five culprits exiting the stolen van after the shooting, and who saw someone putting a shotgun into the van before the shooting, viewed a photo array that included Brooks, Wingo, and Philpot. *Id.*, ¶ 27a. She identified Wingo and Philpot, but did not select Brooks. *Id.* Defendant Kunz documented this non-identification in at least one report, which Defendant Tolliver reviewed. Defendants Cudo and Kovacic were also aware of this information. However, none of the Individual Defendants followed up on this, and, further, this information was not disclosed. *Id.*

Other witnesses, including Johnny Logan (the van's owner), Rosue Pierce (who worked nearby Logan), and Arthur Clayton (who also worked nearby Logan), identified Wingo, but not Brooks, as one of the individuals involved in the van robbery. *Id.*, ¶ 27b. These accounts

contradicted Wingo's statement that he did not steal the van. Defendants Bornfield and Murphy recorded some of these interviews in reports, which Defendants James and Tolliver reviewed and approved. *Id.* Defendants James and Fransen also personally authored reports recording some of this information. *Id.* Again, none of this information was disclosed. *Id.*

Latonya Johnson/Liddell, another impartial witness who saw the four or five culprits leaving the stolen van, identified Darryl Creel (Michael Creel's cousin), but not Brooks, as one of the individuals fleeing from the van after the shooting. *Id.*, ¶ 27d. Johnson/Liddell also reported that the men who left the van after the shooting went to the Creel residence. *Id.* Her account conflicted with Michael Creel's version of the events. *Id.* Defendants Kovacic, Cudo, and Kunz received the original witness reports regarding Johnson/Liddell's statements, and then took and recorded a follow-up statement as well as performing follow up interviews with the Creels. *Id.* The Supervisor Defendants approved the reports of these events. Again, none of this information was disclosed. *Id.*

Throughout the investigation and trial, the only inculpatory evidence in support of Brooks' arrest and prosecution came from the witness statements of Wingo and Creel. *Id.*, ¶ 31. Since the trial, both Wingo and Creel have recanted their statements against Brooks. *Id.*, ¶ 32.

Brooks alleges that each of the named Individual Defendants played a role in the investigation and was either aware of or directly involved in the alleged misconduct. *Id.*, ¶ 36. The Individual Defendants worked closely together in pairs or small groups. *Id.* For example, Defendants Kovacic and Cudo were partners and often worked alongside Defendant Kunz. *Id.* At trial, Defendant Kovacic testified that the homicide detectives involved in the case made decisions collectively. *Id.* Additionally, though witness Johnson/Liddell first interacted with non-defendant officers, it was Defendants Kovacic, Cudo, and Kunz who later interviewed and released the Creels

from police custody, despite Johnson/Liddell's positive identification of Darryl Creel as a suspect. *Id.* Defendants Kovacic and Cudo proceeded to present the case to prosecutors while in possession of exculpatory information. *Id.* Brooks further alleges that all named Individual Defendants had knowledge of one another's actions and did not intervene. *Id.*

### 3.  Plaintiff's Wrongful Conviction

At trial, the prosecution's case relied primarily on the testimony of Creel and Wingo, whose statements have since been recanted, as well as the testimony of Defendant Kovacic. *Id.*, ¶ 40. No physical or forensic evidence linking Brooks to the shooting was ever presented to the jury. *Id.*, ¶ 41. The State argued at trial that Brooks was involved in interstate drug trafficking, and that the men at the park previously attacked Brooks and stole his jewelry as part of a drug turf war. The State claimed that Brooks was one of the shooters trying to get revenge. *Id.*, ¶ 41. However, Brooks had no criminal history and claims he was in New York with family at the time of the incident. *Id.*, ¶ 42. Further, it was Wingo, not Brooks, who was under federal investigation for drug trafficking and connected to the drug trade and turf war. *Id.*, ¶ 43.

Despite presenting an alibi, Brooks alleges that without the exculpatory and impeachment evidence the police suppressed, he could not impeach either Wingo or Creel nor successfully rebut the State's theory of the case. *Id.*, ¶ 44. Brooks alleges he lacked the ability to effectively cross-examine either Wingo or Creel or investigate alternative witnesses whose statements were withheld. *Id.*, ¶ 46. Even after Brooks was indicted, the Individual Defendants remained involved in his trial, assisting other agencies in locating Brooks after his indictment and gathering witness testimony for the State. *Id.*, ¶ 45. Defendant Kovacic sat at the counsel table as the State's representative, and even testified during the trial. *Id.* When Defendant Kovacic testified, he did not testify about the exculpatory evidence that had not been disclosed; rather, he testified consistent

7

with its suppression and his alleged misconduct. *Id.* Despite knowledge of the suppressed exculpatory evidence, Brooks alleges that none of the Individual Defendants intervened to prevent false testimony and incomplete evidence at trial. *Id.*

Brooks was ultimately convicted of murder, attempted murder, and robbery, though the jury did not convict him on the firearm specifications, as no evidence directly linked him to a weapon. *Id.*, ¶ 47. This was a capital case, though Brooks was able to avoid the death penalty at the mitigation stage of his trial. He was sentenced to twenty years to life, plus consecutive sentences on the attempted murder counts. *Id.*, ¶ 48.

### 4.  New Trial and Dismissal of Charges

Over three decades later, Brooks finally obtained the CDP files revealing the exculpatory evidence that was not presented at trial and never disclosed to him. *Id.*, ¶¶ 49-50. Based upon this newly discovered evidence, Brooks' counsel moved for a new trial. *Id.*, ¶¶ 51-57. At the evidentiary hearing on the motion, Brooks' surviving defense attorney, Gordon Friedman, testified he had no knowledge of the withheld materials and would have introduced them if he had them. *Id.* Friedman testified further that, at the time of Brooks' original trial, Cleveland police often failed to produce copies of such evidence to prosecutors. *Id.* The surviving lead trial prosecutor, John Ricotta, testified that he did not recall the withheld materials and could not say if they were in his file at the time of trial. *Id.* Despite having notice of the alleged misconduct, the Cuyahoga County Prosecutor's Office opposed a new trial. *Id.* Nevertheless, the trial court granted the motion, expressly finding that the *Brady* violations undermined Brooks' constitutional rights. *Id.* The County ultimately determined it lacked sufficient evidence to re-try the case, and the trial court dismissed the charges with prejudice. *Id.* Brooks was declared a wrongfully convicted person under Ohio law, with the court citing *Brady* violations as the basis for vacating his conviction. *Id.*

In the time since the original investigation, Brooks alleges that the Individual Defendants' "continuing suppression of evidence prolonged Brooks's [sic] unjust imprisonment." *Id.*, ¶ 59. Well over thirty years have passed since the initial investigation—"[w]itnesses have died, and upon information and belief, even more evidence was lost or destroyed. Brooks cannot now perform testing on now-lost or destroyed items nor interview now dead or disappeared witnesses to learn about even further misconduct which, upon information and belief, Defendants committed." *Id.* Brooks further alleges "upon information and belief, Defendants committed additional *Brady* violations and other unconstitutional conduct still not known to Plaintiff, of a similar kind to that alleged here, which similarly contributed to Plaintiff's injuries, and which Plaintiff still may discover." *Id.*, ¶ 60.

**5. Official Policies and Customs of the City**

Brooks alleges that the Individual Defendants' misconduct in his case "was not rogue," but rather "undertaken pursuant to the City of Cleveland's official policies, patterns, and practices." *Id.*, ¶¶ 61-62. The Court now summarizes these allegations.

Brooks alleges that "[t]he City, through CDP, maintained a decades-long official policy and custom in which police regularly used unconstitutional measures to secure wrongful convictions." *Id.*, ¶ 63. He asserts that these measures included "withholding, suppressing, or destroying exculpatory evidence; fabricating evidence; engaging in suggestive identification and lineup procedures; and engaging in leading, coercive, and unduly suggestive questioning of and contact with witnesses including feeding information to and threatening or bribing witnesses." *Id.* "These [practices] were established for decades before and continued even after Dwayne Brooks's [sic] wrongful conviction." *Id.*

Brooks proceeds to identify a significant number of "cases and historical materials related

9

to the Cleveland police withholding evidence favorable to criminal defendants." *Id.*, ¶ 65. These include cases prior to Brooks' conviction, such as the 1975 wrongful convictions of Wiley Bridgeman, Kwame Ajamu, and Rickey Jackson, and the 1975 wrongful conviction of Isaiah Andrews. Brooks also cites to cases that happened after his conviction, such as the 1991 wrongful conviction of Charles Jackson, the 1995 wrongful conviction of Anthony Lemons, the 2001 wrongful conviction of Michael Buehner, and the 2007 wrongful convictions of Michael Sutton and Kenny Philips.[3] *Id.*

Brooks alleges that "Cleveland police culture of suppressing evidence and otherwise committing misconduct leading to wrongful convictions has been passed on from officer to officer, approved from supervisor to supervisor, through the decades." *Id.*, ¶ 66.

> For example, the same supervising officers who oversaw the investigation against Dwayne Brooks (Defendants Fransen, James, and Kaminski) also oversaw the investigation leading to the wrongful conviction of Charles Jackson. Similarly, some of the same officers who had become more senior participants in the investigations against Brooks and Jackson in the late 1980s and early 1990s (for example, Defendant Kaminski, and additional officers not named here, including Comodeca, Moore, Hicks, and Allen) were previously involved in the 1970s investigations against Isaiah Andrews or Ricky Jackson, Kwame Ajamu, and Wiley Bridgeman or both.

*Id.* In further support of his argument on entrenchment, Brooks notes that "[o]ne of the first patrolmen to arrive at the crime scene at issue in the Brooks investigation back in 1987 was Calvin Williams, the City's most recent former Chief of Police." *Id.*, ¶ 67. According to Brooks, the Sixth Circuit has recognized not only CDP's official policy permitting misconduct, but also CDP's "longstanding failure to train its officers in this regard," citing *Ricky Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). *Id.*, ¶ 77. In addition, Brooks alleges "CDP has a documented

---

[3] A complete collection of the cases Brooks cites in support of his allegations can be found in the Complaint, ECF 5, ¶¶ 65-69.

historical practice reaching back to the 1970s of using similar unconstitutional measures including fabricating evidence, using suggestive and/or coercive identification procedures, and coercing witnesses to testify untruthfully. This practice was passed down and has been documented in all the same ways." *Id.*, ¶ 68.

Brooks also identifies a number of historical records outside of courts of law documenting these policies and practices. In his 1973 autobiography, then-Mayor Carl Stokes reflected on "the failures of the Cleveland Division of Police and its officers." *Id.*, ¶ 71. Mayor Stokes noted that CDP officers were "all almost totally lacking in the training in human relations that some departments have at least made a beginning to provide." *Id.* (quoting Carl Stokes, Promise of Power 173 (1973)). He "also remarked on the policy or practice under which improper or criminal conduct toward black people was left without consequence: 'And all the police knew that few policemen faced charges or an appearance before the grand jury for shooting a black man while on duty.'" *Id.* (quoting Stokes, *supra*, at 173).

In 1974, then-Mayor Stokes appointed the Cleveland Crime Commission to investigate police corruption within the city. *Id.*, ¶ 72. The Commission produced a report on police corruption and criminal conduct, recommending significant structural changes that "would establish lines of responsibility and accountability and would foster the changes necessary to correct the structural, organizational and procedural sources that can lead to police corruption and misconduct." *Id.* (quoting Mayor's Crime Commission, Report with Recommendations 3 (1974)). The report included with it a 1966 study by Public Administration Service on CDP, which noted that the Police Division's "formal organization violates sound organizational concepts in many respects. It is further confused by informal arrangements, power centers, and unusual lines of communications which make the apparent structure of organization virtually meaningless." *Id.*,

¶ 73 (quoting Mayor's Crime Commission, *supra*, app. B at 20). The study further noted "[t]he management process of directing is but little exercised by many commanders and effective field supervision is virtually non-existent." *Id.* (quoting Mayor's Crime Commission, *supra*, app. B at 22). "The problems of police and community relations are so critical in Cleveland that they warrant immediate and serious attention[.] . . . Yet the division stands aloof from very serious community problems, and it has no real program directed toward the analysis of these problems, nor for their solution. Training in police and community relations is not offered in sufficient depth or extent." *Id.*, ¶ 74 (quoting Mayor's Crime Commission, *supra*, app. B at 23).

In 1975, the Cleveland Foundation issued a report after conducting an extensive study of the CDP, including interviewing the Chief of Police and many officers within the CDP. *Id.*, ¶ 75. The report noted a "lack of supervision over the massive power delegated to subordinate officers." *Id.* Additionally, the report found that "[t]here was no 'ongoing inservice training' for all officers, with 'inservice training' defined as 'the periodic training received by a police officer throughout his career to maintain, update, and improve his police knowledge and skills.'" *Id.* (quoting Cleveland Foundation, <u>Private Sector Assistance to the Cleveland Division of Police</u> 27 (1975)).

Brooks alleges that "the City and CDP have a similarly entrenched history of failing to supervise, investigate, and discipline allegations of officer misconduct like that at issue here." *Id.*, ¶ 76. For example, Brooks cites to testimony in *Ricky Jackson* from former CDP Commander William Tell. *Id.* ¶¶ 78-81. Commander Tell testified "that it was well known among CDP officers that they could get away with serious misconduct without being disciplined." *Id.* (citing Tell Aff., ¶ 15(a), *Ricky Jackson v. Cleveland*, Case No. 1:15-CV-989 (N.D. Ohio Jan. 27, 2017), Dkt. No. 103-3).

According to Tell, this was reflected in specific incidents, including the department's

failure to investigate or discipline a detective despite public complaints and news reports alleging the use of excessive force and false testimony. *Id.* Tell recounted an early 1980s incident where he reported concerns regarding another officer's fabrication of evidence and use of force during the investigation of a shooting involving a young woman. *Id.*[4] He testified that Internal Affairs ruled the complaint unsubstantiated and did not take action. *Id.* He claimed that the police department covered up the true events of the case, and that the conclusion reached by Internal Affairs was "purposefully untrue." *Id.* Tell stated that misconduct by officers, including physical violence during interrogations, were rarely reported or addressed. *Id.* He reported acts of physical violence by fellow officers, such as punching suspects in the face and head and knocking them down in effort to get those suspects to confess or implicate others, yet when "Tell attempted to notify superiors in the CDP of the wrongful conduct . . .  he was either reprimanded or told not to pursue the claims of misconduct any further." *Id.* He attributed the lack of internal reporting in part to a fear of officers who spoke up being ostracized, and a pervasive "Code of Silence". *Id*

In both affidavit and deposition testimony, Tell described a departmental culture in which silence around misconduct was expected and reinforced. *Id.* He stated that this "Code of Silence" was reflected in training and disciplinary practices, and that officers learned to refrain from reporting constitutional or legal violations to avoid personal or professional consequences. *Id.* Tell linked this practice to various cases over several decades, including many that Brooks cites elsewhere in his Complaint for support (and described above) in which misconduct allegedly occurred but was not disclosed by officers at the time. *Id.* Brooks alleges that "[t]his practice and policy of a Code of Silence over the years leading up to and beyond the prosecution of Plaintiff is evident in the testimony of former CDP Commander William Tell as far back as the 1960s and

---

[4] Specific language from Commander Tell's testimony can be found in Brooks' Complaint, ECF 5, ¶¶ 79-82.

70s, through the time of all of the misconduct described in this complaint and beyond." *Id.* Brooks further alleges that "[i]n all these cases and others listed in this Complaint, officers of CDP, like Defendant Kovacic, sat by at counsel table or testified at trials of innocent people, and maintained silence when they were tried and convicted based upon false or incomplete evidence." *Id.*

Brooks alleges that because of the above, "CDP officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of consequences from their leadership or the City." *Id.*, ¶ 83. Brooks also alleges that "policymakers for the City and CDP knew of all these problems, allowed them to continue, and made decisions not to implement adequate policies, training, or supervision, even though the need for a legitimate mechanism for new or different policies, training, oversight, or punishment of officers was obvious." *Id.*, ¶ 84. According to Brooks, "[t]he widespread pattern and practice of using unconstitutional measures to secure convictions was so well settled as to constitute a de facto policy in the Cleveland Division of Police," and "municipal policymakers with authority over the practice exhibited deliberate indifference to the problem, ratifying it." *Id.*, ¶ 85.

Brooks alleges that the misconduct described in his Complaint was undertaken pursuant to the official policy of the City and CDP, and that the constitutional violations alleged were a "predictable consequence of such official policy, which was the moving force behind the violations." *Id.*, ¶ 87. This included the City's policymakers knowing

> among other things, that there was a need to implement policies and train, supervise, and discipline police officers related to how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct interrogations and witness interviews, how to conduct identifications or lineups or showups, how to conduct arrests, how to write police reports or notes of witness statements and evidence, and how not to conduct unduly suggestive identifications or interrogations.

14

*Id.*, ¶ 86. In spite of this, "[t]he City and CDP decided not to implement any legitimate mechanism for oversight or punishment of officers," causing the "[Individual] Defendants to believe that they could abuse Dwayne Brooks's [sic] rights and cover up what they did without fear of discipline." *Id.*, ¶¶ 86, 88. According to Brooks, the City and officials within the CDP "failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct" and similar misconduct "continu[ing] to accumulate over decades." *Id.*, ¶¶ 90-91.

### B. Procedural Background

On September 17, 2024, Plaintiff filed their initial Complaint against the City of Cleveland and the Individual Defendants. On December 10, 2024, Plaintiff filed their First Amended Complaint ("Complaint").[5] ECF 5. The Complaint alleges eight causes of action: (1) violations of 42 U.S.C. § 1983 under the Fifth, Sixth, and Fourteenth Amendments for *Brady* violations and deprivation of the right to a fair trial; (2) violations of 42 U.S.C. § 1983 under the Fourth and Fourteenth Amendments for malicious prosecution; (3) reckless breach of duty under Ohio law; (4) civil liability for criminal acts under Ohio Rev. Code § 2307.60(A)(1); (5) malicious prosecution under Ohio law; (7) abuse of process under Ohio law; (8) supervisor liability under 42 U.S.C. § 1983 against the Supervisor Defendants[6] only; and (8) a *Monell* policy and practice claim under 42 U.S.C. § 1983[7] against the City of Cleveland only. On December 10, 2024, the

---

[5] Plaintiff's First Amended Complaint has no substantive differences in its claims from the initial Complaint filed three months earlier. The only difference is that the parties determined that the wrong "Edward Kovacic" had been identified in the initial Complaint, and thus needed to be substituted out in the First Amended Complaint. No defendant raises an objection to whether or not the First Amended Complaint relates back to the date of the initial Complaint for the purposes of calculating a statute of limitations. As such, this Court declines to consider such an issue and will use the September 17, 2024, date of filing for the initial Complaint as the relevant date for all limitations calculations.

Additionally, because there are no substantive differences between the initial Complaint and the First Amended Complaint, the Court will simply refer to the latter as the "Complaint."

[6] Out of the Individual Defendants, the Complaint recognizes the following individuals specifically as "Supervisor Defendants": John James; John Fransen, the Estate of John Kaminski; and the Estate of Robert Tolliver. *See* ECF 5, ¶ 5.

[7] In limited circumstances, for the purpose of defining a "person" within the context of § 1983, a municipality can be

City of Cleveland and the Individual Defendants filed their Answers. ECF 7-8 (respectively).

On May 19, 2025, the City of Cleveland filed a Motion for Judgment on the Pleadings. ECF 28. The same day, the Individual Defendants filed a Partial Motion for Judgment on the Pleadings. ECF 29. Plaintiff filed their Oppositions to both Motions on July 2, 2025. ECF 38-39 (respectively). On July 23, 2025, the City of Cleveland and the Individual Defendants filed replies in support of their respective Motions for Judgment on the Pleadings. ECF 50-51 (respectively).

Both Motions are now ripe for ruling.

## II.  STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." When the motion is made without any additional evidence beyond what is contained in the complaint and answer, the Court analyzes a Rule 12(c) motion under the same standard as a Rule 12(b)(6) motion to dismiss. *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 386 (6th Cir. 2022); *cf. Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020) (noting that a complaint cannot be amended or supplemented through briefing when evaluating a Rule 12(b)(6) motion). However,

> [t]he court can also consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion for judgment on the pleadings that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice.

*Dudek v. Thomas & Thomas Att'ys & Couns. at L., LLC*, 702 F. Supp. 2d 826, 832 (N.D. Ohio 2010) (citing *Whittiker v. Deutsche Bank National Trust Co.*, 605 F.Supp.2d 914, 924-25 (N.D.

---

found liable. *See Monell v. Dept't of Social Services*, 436 U.S. 658, 690 (1978) ("Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." (emphasis in original)).

Ohio 2009); *Greenberg v. Life Ins. Co.*, 177 F.3d 507, 514 (6th Cir.1999)); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). This includes references to other lawsuits. *See New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) (finding that the court could consider a prior complaint when ruling on a motion to dismiss because "such materials are public records or are otherwise appropriate for the taking of judicial notice").

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'a formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). The Court must construe the complaint in the light most favorable to the plaintiff, accept the complaint's factual allegations as true, and determine whether plaintiff "undoubtedly can prove no set of facts in support of his claim that would entitle him to relief." *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (quotation omitted). Additionally, "[m]ere labels and conclusions are not enough; the allegations must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

While *Twombly* and *Iqbal* raised the pleading standard in complaints to "plausibility," it did not change the

> well-established principle that Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief. Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.

*Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (internal quotation marks omitted) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

17

### III. ANALYSIS

### A.  CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

The Court begins with the Individual Defendants' Motion.

#### 1.  Threshold Matters

##### i.  Timeliness of All State Law Claims

In their Motion, the Individual Defendants argue that all of Plaintiff's Ohio law claims should be considered time-barred. ECF 29-1 at 5-6. Ohio Revised Code § 2744.04(A) requires that all tort actions brought against political subdivisions be brought within a two-year statute of limitations. Since this statute also applies to tort actions against employees of political subdivisions, it necessarily governs Plaintiff's claims against the Individual Defendants. ECF 29-1 at 6; *see also* ECF 51 at 4-10.

In response, Plaintiff argues that the statute only applies to political subdivisions themselves and not their employees. ECF 39 at 1-4. Therefore, the Individual Defendants should not get the benefit of the shorter statute of limitations.

There is no doubt that the Individual Defendants, as police officers in the Cleveland Police Department, are employees of a political subdivision, so the question is whether O.R.C. § 2744.04(A) encompasses them or just the city. Plaintiff urges this Court to look to the plain language of the statute, which, he suggests, gives a clear answer. Section 2744.04(A) states that it applies to "[a]n action against a political subdivision," whereas § 2744.04(B) states that it applies to "complaint[s] filed in a civil action against a political subdivision *or an employee* of a political subdivision" (emphasis added). There are other instances in this same section where the Ohio legislature appears to distinguish between "political subdivision" and "political subdivision or an employee of a political subdivision." *See* ECF 39 at 3 (collecting examples). Plaintiff argues that

this is evidence that, if the Ohio legislature had wanted § 2744.04(A) to apply to employees of a political subdivision, they surely would have included that language in the text. Its omission from § 2744.04(A) is clearly intentional, he argues, and "[t]he Court should decline the Individual Defendants' invitation to add words to § 2744.04(A)." ECF 39 at 3.

It is true that the Individual Defendants' reading of § 2744.04(A) has "not been universally embraced by the Ohio courts." *Bickerstaff v. Cuyahoga County*, Case No. 1:18-cv-1142, 2022 WL 6252835, at *11 (N.D. Ohio Apr. 26, 2022) (citing *Pippin v. City of Reynoldsburg*, Case No. 2:17-cv-598, 2019 WL 4738014, at **9–10 (S.D. Ohio Sep. 27, 2019)), *report and recommendation adopted in relevant part*, 2022 WL 4102742 (N.D. Ohio Sep. 8, 2022). Neither has the Ohio Supreme Court expressly weighed in on this issue. *See id.* at *11 (citing *Dolan v. City of Glouster*, Case No. 11CA18, 2014-Ohio-2017, at ¶ 87 n.20 (Ct. App.)). And reading § 2744.04(A) to include employees of political subdivisions would appear to be counter to traditional canons of statutory interpretation.

This situation would ordinarily require this Court to attempt to predict how the Ohio Supreme Court would rule if presented with this issue. *See Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1089 (6th Cir. 2016). However, the Sixth Circuit has already had a chance to weigh in on this matter. The panel in *Kerr v. Pollex* expressly noted that "claims against employees of a political subdivision are subject to the two-year statute of limitations set forth at Ohio Revised Code § 2744.04(A), which 'prevails over the *general* statutes of limitations contained in R.C. Chapter 2305.'" Case No. 22-cv-3993, 2023 WL 8358798, at *3 (6th Cir. Aug. 11, 2023) (quoting *Davis v. Clark Cnty. Bd. of Comm'rs*, 2013-Ohio-2758, ¶ 23, 994 N.E.2d 905, 909 (Ct. App.) (emphasis in original)). While it is true that unpublished decisions from the Sixth Circuit are not binding, they are still persuasive. *See, e.g.*, *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011).

Combining this with the weight of authority from Ohio appellate courts also choosing to interpret § 2744.04(A) to include employees of political subdivisions, *see* ECF 51 at 6-7 (collecting cases), this Court is convinced that it must follow this interpretation.

As such, the claims against the Individual Defendants, as employees of a political subdivision, are subject to the two-year statute of limitations defined in O.R.C. § 2744.04(A). This Court will apply this statute of limitations when evaluating the timeliness of Plaintiff's tort claims.[8]

### ii. False Arrest Claim

While the Complaint does not explicitly raise any claim for false arrest, the Individual Defendants' Motion argues "[t]o the extent Plaintiff's § 1983 claims are based on false arrest or false imprisonment, the claims are also barred by the statute of limitations." ECF 29-1 at 8. They argue this is because, as discussed *supra*, tort actions against employees of a political subdivision at subject to a two-year statute of limitations under Ohio law. *Id.* at 6, 8-9; *see also Wallace v. Kato*, 549 U.S. 384, 387 (2007) (affirming that, for § 1983 actions, state law provides the applicable statute of limitations). "When the claim is for false arrest, a section 1983 cause of action accrues on the date the arrest was made." *McCune v. City of Grand Rapids*, 842 F.2d 903, 906 (6th Cir. 1988). Since Plaintiff's Complaint was filed indisputably outside the statute of limitations for this claim, any claim for false arrest is necessarily time-barred.

In his response to the Individual Defendants' Motion, Plaintiff "does not oppose judgment on the pleadings for the false arrest claim only." ECF 39 at 1.

Thus, the Court grants the Individual Defendants' Motion to the extent any of Plaintiff's

---

[8] The Individual Defendants argue that O.R.C. § 2744.04(A) should be applied uniformly to all of Plaintiff's state law claims. ECF 29-1 at 6. This is because "Plaintiff has been aware of the state-law claims since at least 2021," when he filed his motion for a new trial. *Id.* As the instant Complaint was filed in 2024, this would place it outside the two-year statute of limitations, and the state law claims would be time-barred. However, as discussed *infra*, the accrual date is not uniform for all of Plaintiff's state law claims. This Court will thus evaluate the timeliness of each claim only following an analysis determining the proper accrual date.

§ 1983 claims are based on an alleged false arrest.

### 2. Tolliver Estate

Though Plaintiff asserts his claims uniformly across each of the Individual Defendants, the Individual Defendants correctly note that it is not possible for this Court to evaluate the claims in the same manner. Officer Robert Tolliver, Sr. died on May 16, 2007—seventeen years before this lawsuit was filed. ECF 8, ¶ 23. "The Application for Authority to Administer his Estate and Application to Reopen Estate and Appoint Fiduciary were both filed September 16, 2024." *Id.* Plaintiff filed his suit the next day. *Id.*

Plaintiff's state law claims are obviously governed by Ohio law on pursuing claims against estates. Plaintiff's claims under federal law all are based in 42 U.S.C. § 1983, which does not provide for how claims should proceed against a decedent's estate. *See Robertson v. Wegmann*, 436 U.S. 584, 589 (1978) (citing *Moor v. County of Alemeda*, 411 U.S. 693, 702 n.14 (1973)). In these situations, courts are directed to fill in the gap in federal law with state law so long as it is consistent with the Constitution and federal law. 42 U.S.C. § 1988(a). This evaluation requires courts to determine: (1) whether a suitable federal rule exists; (2) whether Congress left the gap for state law to fill; (3) if a gap exists, what is the "most analogous" state rule; and (4) whether the state rule is "inconsistent with the Constitution and laws of the United States." *Est. of Andrews v. City of Cleveland*, 112 F.4th 436, 439 (6th Cir. 2024) (quoting *Wilson v. Garcia*, 471 U.S. 261, 267-68 (1985)).

Applying this test, the Sixth Circuit recently held in *Estate of Andrews* that Ohio's presentment statute (O.R.C. § 2117.06) provides the applicable statute of limitations for § 1983 actions against a decedent's estate. 112 F.4th at 439-40. This Ohio law states that "[a]ll creditors having claims against an estate" must present their claims "within six months after the death of the

decedent." O.R.C. § 2117.06(A)-(B). Alternatively, for contingent claims that do not accrue until after the decedent's death, they "shall be presented . . . before the expiration of six months after the date of death of the decedent, or before the expiration of two months after the cause of action accrues, whichever is later[.]" *Id.* § 2117.37. If a plaintiff fails to present their claim within the specified period, "[n]o payment shall be made on the claim and no action shall be maintained on the claim." *Id.* § 2117.06(C).

As previously noted, Officer Tolliver died on May 16, 2007. Any claims that had already begun to accrue at that time were required to be presented to the estate no later than November 16, 2007. However, at least some of Plaintiff's claims did not accrue until years later when his conviction was invalidated. The absolute latest this could have happened was September 22, 2023, when Judge McGinty of the Cuyahoga Court of Common Pleas dismissed the criminal case against Plaintiff with prejudice. September 22, 2023 Journal Entry, Case No. CR-88-230828-ZA (Cuyahoga Cnty. C.P.). Any claims that did not accrue until that date were required to be presented no later than November 22, 2023. Plaintiff did not file an application to reopen the Tolliver Estate until September 16, 2024, which was well after this deadline had passed.

Plaintiff does not dispute that *Estate of Andrews* directs this Court to apply O.R.C. § 2117.06 to his claims against the Tolliver Estate.[9] However, the presentment statute only states that "[n]o payment shall be made on [a] claim" that is not timely presented to the estate. Further,

---

[9] Plaintiff urges this Court to ignore this holding in *Estate of Andrews*, stating that the "opinion improperly conflated a party's capacity to be sued with a plaintiff's ability to recover monetary damages from that party." ECF 39 at 15. Plaintiff goes on to argue that O.R.C. § 2117.06 governs only the ability to access an estate's assets, so it should not apply when the estate would not be responsible for paying out any potential monetary judgment. While it may be true that, in most cases, the City would end up indemnifying its employees in judgments connected to official activities, it is not <u>mandatory</u> for the City to do so. *See Estate of Andrews*, 112 F.4th at 441 ("The Ohio indemnification statute still covers only an employee's acts or omissions in connection with a governmental or proprietary function if at the time of the acts or omissions the employee was acting in good faith and within the scope of employment or official responsibilities." (cleaned up) (citing O.R.C. § 2744.07(A)(1)-(2))). Therefore, since Brooks "seeks a remedy that might require the estates to pay the price, he must follow Ohio's timelines for making claims on an estate." *Id.*

Ohio Supreme Court has clarified that "[t]he presentment requirements of R.C. 2117.06 apply only to those claims which may be allowed as debts payable out of the assets of an estate." *Lewis v. Steinreich*, 1995-Ohio-133, 652 N.E.2d 981, 984 (citing *Staley v. Kreinbihl*, 89 N.E.2d 593, 599 (Ohio 1949)). Unlike the plaintiff in *Estate of Andrews*, however, Plaintiff here is seeking both monetary <u>and declaratory</u> judgment against the Individual Defendants. Since declaratory judgment may be sought "whether or not further relief is or could be" pursued, this form of relief would seem to be unbound by the Ohio presentment statute. 22 U.S.C. § 2201(a).

Ordinarily, this Court would refrain from issuing solely a declaratory judgment against a defendant—particularly a deceased defendant—as it would essentially amount to an advisory opinion, which is not permitted. However, Plaintiff is also pursuing a § 1983 claim against the City under a theory of *Monell* liability. ECF 5, ¶¶ 157-64. In order to successfully pursue a *Monell* claim against the City, Plaintiff is required to prove at least one underlying constitutional violation against him. *Cf. Chambers v. Sanders*, 63 F.4th 1092, 1101 (6th Cir. 2023) ("As no constitutional rights violation occurred under the facts alleged, Chambers and Smith's *Monell* claim was also properly dismissed."). It is possible that, ultimately, the only one of the Individual Defendants to have violated Plaintiff's constitutional rights is Officer Tolliver. In that case, Plaintiff would have no chance to succeed on his *Monell* claim against the City without a declaratory judgment against Officer Tolliver.

Accordingly, the Court will only dismiss Plaintiff's claims against the Tolliver Estate to the extent they seek monetary relief. Claims against the Tolliver Estate may proceed <u>only</u> for declaratory relief.

23

### 3. Reckless Breach of Duty

The Court next turns to Count Three alleging a reckless breach of duty under Ohio law. The Individual Defendants challenge both the timeliness and merits of Plaintiff's reckless breach of duty claim. The Court addresses each argument, separately, below.

### i. Timeliness

Individual Defendants first argue that "[a]ny claim for breach of duty arose at the time of the investigation" which "was conducted in 1987 and 1988[,]" thus rendering this suit, filed in 2024, time-barred under O.R.C. § 2744.04(A)'s two-year statute of limitations. ECF 29-1f at 6. In opposition, Plaintiff argues that because the Individual Defendants' breach of duty caused him to be incarcerated until he was granted a new trial on April 12, 2023, the statute of limitations did not accrue until then, so his claim is timely.

Important to this determination is understanding what, exactly, Plaintiff is challenging with his reckless breach of duty claim. Is he challenging actions taken <u>without</u> legal process, or is he challenging actions taken under the <u>wrongful institution</u> of legal process? *See Wallace*, 549 U.S. at 389-90. The Supreme Court has held that claims such as false imprisonment or false arrest are claims alleging a lack of legal process. *Id.* at 389. As such, once the plaintiff "becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges"—the tort has concluded and accrual for a cause of action begins. *Id.* (emphasis in original) (citation omitted). Conversely, claims such as malicious prosecution allege an improper use of the legal process, and allow plaintiffs to receive damages for confinement imposed pursuant to the legal process. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994). A requirement for a malicious prosecution claim is a termination of the prior criminal proceeding in favor of the criminal defendant. *Id.* The Supreme Court has explained that

24

> [t]his requirement avoids parallel litigation over the issues of probable cause and guilt, and it precludes the possibility of the claimant succeeding in the tort action after having been convicted in the underlying criminal prosecution, in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction. Furthermore, to permit a convicted criminal defendant to proceed with a malicious prosecution claim would permit a collateral attack on the conviction through the vehicle of a civil suit.

*Id.* (cleaned up) (quotations omitted).

So which is Plaintiff's claim for reckless breach of duty more like? In his Complaint, Plaintiff alleges that the Individual Defendants recklessly breached their duties as police officers in a variety of manners, including failure to adequately investigate the crime, causing a malicious prosecution, and committing *Brady* violations. ECF 5, ¶ 126. This Court finds that Plaintiff's claim is one that attacks the validity of his conviction through an improper use of the legal process. The thrust of Plaintiff's argument is that the *Brady* violations were a direct consequence of the Individual Defendants recklessly breaching their duties, and the Sixth Circuit has previously held that "[t]he closest common-law analogy to a *Brady* claim is one for malicious prosecution." *Jordan v. Blount Cnty.*, 885 F.3d 413, 415 (6th Cir. 2018). If it were not for the suppressed evidence, Plaintiff may not have been convicted at his original trial.

The only way to show that these claims actually invalidate any criminal conviction against Plaintiff is a termination of the criminal proceedings in favor of Plaintiff. The Supreme Court has held that "termination of the criminal proceedings in favor of a plaintiff" does not encompass all potential dispositions of the proceedings in favor of the criminal defendant. Rather, it is specifically limited to those situations such as where "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 487. Notably absent from this list is mere vacatur of the conviction or

granting a motion for a new trial. That is because neither of those dispositions actually terminate the criminal proceedings. *See King v. Harwood*, 852 F.3d 568, 579 (6th Cir. 2017) (holding that when a guilty plea was vacated and the "case was remanded for trial on the same charges that formed part of the malicious prosecution," a claim for malicious prosecution did not accrue until the indictment was ultimately dismissed); *Jordan*, 885 F.3d at 415-416 (distinguishing a *Heck* invalidation from ordinary vacatur by emphasizing that *Heck* invalidations terminate the criminal proceedings by preventing the State from retrying the criminal case). Thus, "[o]nly once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated within the meaning of *Heck*, will the statute of limitations begin to run." *McDonough v. Smith*, 588 U.S. 109, 119-20 (2019) (citation omitted).

None of the situations identified in *Heck* apply to Plaintiff's prior criminal conviction, so the Court looks to when the criminal proceedings against Plaintiff actually ended. Following the reasoning provided by the Sixth Circuit, the Court specifically looks for when the State was no longer able to prosecute Plaintiff for the underlying indictment. *See, e.g.*, *King*, 852 F.3d at 579; *Jordan*, 885 F.3d at 415-416. The charges against Plaintiff were dismissed with prejudice on September 22, 2023. September 22, 2023 Judgment Entry, Case No. CR-88-230828-ZA (Cuyahoga Cnty. C.P.). He filed his Complaint on September 17, 2024. As such, Plaintiff's claim for reckless breach of duty falls within the two-year statute of limitations outlined in O.R.C. § 2744.04(A).

### ii.  Merits

Regardless of timeliness, the Individual Defendants aver that reckless breach of duty is not a viable claim recognized under Ohio law. ECF 29-1 at 10. In response, Plaintiff asserts that he is bringing what could be considered a standard breach of duty action, and "[his] incorporation of

the word 'reckless' simply conveys that the Individual Defendants' actions do not merit statutory immunity" under O.R.C. § 2744.03(A)(6)(b). ECF 39 at 12. Though it is generally well-known that employees of a political subdivision cannot be sued for ordinary negligence, *see, e.g.*, *Anderson v. City of Massillon*, 2012-Ohio-5711, 983 N.E.2d 266, at ¶ 23, the Ohio Supreme Court has held that "Ohio law permits plaintiffs to sue and hold liable employees of a political subdivision if the employees' acts or omissions in the course and scope of their employment were wanton or reckless." *Maternal Grandmother v. Hamilton Cnty. Dept. of Job & Fam. Servs.*, 2021-Ohio-4096, 193 N.E.3d 536, at ¶ 7 (citing O.R.C. § 2744.03(A)(6)(b)). This does not require plaintiffs to satisfy any sort of "heightened pleading standard in a case involving R.C. 2744.03(A)(6)(b)'s exception to immunity for wanton or reckless behavior" and "notice pleading suffices." *Id.*, 2021-Ohio-4096, 193 N.E.3d at ¶¶ 9, 17.

As Plaintiff points out in his response, Ohio law recognizes that "law enforcement officers have a duty to investigate criminal conduct and to develop and maintain evidence of a crime, and are 'charged with the duty to prevent crime, preserve the peace, and protect persons and property.'" *Moore v. City of Cleveland*, 2017-Ohio-1156, 87 N.E.3d 858, at ¶ 27 (Ct. App.) (quoting *State v. Lunder*, 2017-Ohio-84, 80 N.E.3d 1213, at ¶ 18 (Ct. App.)). The Ohio Supreme Court recently reinforced that officers have an overarching statutory "duty to enforce criminal laws and apprehend offenders." *Argabrite v. Neer*, 2016-Ohio-8374, 75 N.E.3d 161, at ¶ 77 (Pfeifer, J., concurring in relevant part) (citing *State v. White*, 2015-Ohio-492, 29 N.E.3d 939, at ¶ 32). But "[t]his duty does not exist in a vacuum: it exists in tandem with the officers' duty to avoid causing harm wantonly or recklessly." *Id.*, 2016-Ohio-8374, 75 N.E.3d, at ¶ 77

Plaintiff's Complaint states that the Individual Defendants broadly "breached their duty to investigate the murder and instead suppressed exculpatory evidence to frame [Plaintiff]," detailing

27

how they worked to suppress certain witness statements and failed to follow up on leads that suggested someone other than Plaintiff committed the murder. ECF 5 at 4. Plaintiff further alleges that the "[Individual] Defendants recklessly breached their duties to [Plaintiff], to the victims of this crime, and to the public" by "letting potentially dangerous criminal suspects loose in the community to commit crimes while locking up the wrong man[.]" *Id.*, ¶ 126. In consideration of the low standard required to survive a Rule 12 motion, the Court finds that Plaintiff has sufficiently alleged that the Individual Defendants both owed a duty to Plaintiff and breached that duty.

This brings the Court to its analysis of whether the Individual Defendants are entitled to statutory immunity under O.R.C. § 2744.03(A). Although O.R.C. § 2744.03(A) generally immunizes political subdivisions and employees of political subdivisions from civil liability in connection with a governmental or proprietary function, "[t]hat immunity is not absolute." *Maternal Grandmother*, 2021-Ohio-4096, 193 N.E.3d, at ¶ 7. Instead, employees of political subdivisions are not entitled to statutory immunity if "[t]he employee's actions or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(6)(b). "Wanton misconduct" is defined as "the failure to exercise *any* care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Argabrite*, 2016-Ohio-8374, 75 N.E.3d, at ¶ 8 (emphasis in original) (internal quotation marks omitted) (quoting *Anderson*, 2012-Ohio-5711, 983 N.E.2d, at paragraph 3 of the syllabus). Relatedly, "reckless conduct" is defined as "conduct that is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* (internal quotation marks omitted) (quoting *Anderson*, 2012-Ohio-5711, 983 N.E.2d, at paragraph 4 of the syllabus).

28

In his Complaint, Plaintiff alleges the Individual Defendants committed several *Brady* violations by suppressing evidence, engaged in witness intimidation and coercion, and helped cover this type of misconduct by their fellow officers. Officer Edward Kovacic is specifically alleged to have essentially perjured himself by "testif[ying] consistent with his misconduct, rather than explaining the truth of what happened or the exculpatory aspects of what he knew." ECF 5, ¶ 45. These allegations, which are entitled to a presumption of truth at this stage, undeniably rise to the level of "malicious purpose," "bad faith," or acting in a "wanton or reckless manner."

As a secondary issue, the Individual Defendants argue that, even "if such a claim did exist under Ohio law, a plaintiff must allege how *each* officer acted in a reckless manner." ECF 29-1 at 10 (emphasis in original) (citing *Moore*, 2017-Ohio-1156, 87 N.E.3d 858, at ¶ 29); *see also* ECF 51 at 9 (reiterating this argument). *Moore* is the only case the Individual Defendants cite in support of this argument—but nowhere in *Moore* does the court state that plaintiffs are required to plead with specificity how each individual defendant "acted in a reckless manner." Instead, the court in *Moore* simply happened to analyze officer immunity on an individual basis. *Moore*, 2017-Ohio-1156, 87 N.E.3d, at ¶ 29 ("We shall consider the R.C. 2744.03(A)(6)(b) immunity exception with regard to each of the appellees."). While Plaintiff must ultimately prove individual liability at trial, the Sixth Circuit has held that a plaintiff can survive summary judgment even if "unable to definitively identify which officer committed allegedly unconstitutional acts … [if] he introduces sufficient evidence to place the officer at the scene." *Batson v. Hoover*, 788 Fed. App'x. 1017, 1020 (6th Cir. 2019) (citation omitted). This standard is arguably satisfied when Plaintiff has limited their allegations to a "small group of officers that committed allegedly unconstitutional acts within each other's presence." *Fazica v. Jordan*, 926 F.3d 283, 292 (6th Cir. 2019). This is plainly the case here, where the Complaint identifies a small group of

specific officers involved in the investigation of Plaintiff, who are all alleged to have engaged in unlawful misconduct and helped to cover up each other's unlawful misconduct. At the Rule 12 motion stage, the standard is more lenient than the standard for summary judgment; as such, the Court finds that Plaintiff has plead sufficient specificity to put the individual officers on notice of their potential liability.

Accordingly, the Court declines to dismiss Plaintiff's claim for reckless breach of duty.

### 4. Civil Liability for Criminal Acts (O.R.C. § 2307.60(A)(1))

Now, the Court turns to Count Four alleging civil liability for criminal acts under O.R.C. § 2307.60(A)(1). Under this statute, a plaintiff has a statutory cause of action to recover damages stemming from criminal acts. While it is well-established that there is no requirement for an underlying criminal conviction, *see Buddenberg v. Weisdack*, 2020-Ohio-3832, 161 N.E.3d 603, at ¶ 11, a plaintiff does need to be able to point to a specific criminal statute that the defendant allegedly violated, *see Jacobson v. Kaforey*, 2016-Ohio-8434, 75 N.E.3d 203, at ¶ 10 (noting that O.R.C. § 2307.60(A)(1) "specifically authorize[s] a civil action for *damages based on the violation of any criminal statute*" (emphasis added)). In his Complaint, Plaintiff alleges that the Individual Defendants violated O.R.C. § 2921.45(A), which, in relevant part, makes it a crime for a "public servant, under color of the public servant's office, employment, or authority, [to] knowingly deprive or conspire or attempt to deprive any person of a constitutional or statutory right."

Because the Individual Defendants did not raise a challenge on the merits of this claim in their Motion, the Court accepts that Plaintiff has sufficiently pled facts that, if true, would make out a claim for civil liability for a criminal act. The only challenge the Individual Defendants bring to this claim is that it is time-barred.

Plaintiff acknowledges that, applying this statute generally, courts are split as to whether

the one-year or six-year statute of limitations applies. *See* ECF 39 at 7; *see also America's Wholesale Outlet LLC v. Eckert*, 2024-Ohio-5680, 259 N.E.3d 809, at ¶¶ 54-64 (collecting and discussing cases). However, as previously discussed, *supra* section III.A.1.i, Plaintiff's claims against the Individual Defendants are also subject to O.R.C. § 2744.04(A). Any state law claims brought against the Individual Defendants "shall be brought within two years after the cause of action accrues, *or within any applicable shorter period of time* for bringing the action provided by the Revised Code." O.R.C. § 2744.04(A) (emphasis added). However, the Court need not decide whether a six-year, two-year, or one-year statute of limitations applies, because it finds that Plaintiff's claim for civil liability for criminal acts did not accrue until the charges against him were dismissed with prejudice on September 22, 2023. Plaintiff filed his Complaint within a year of this date, so his claim is timely under any of the above-noted statutes of limitations.

Much like its sister court in *Buehner v. City of Cleveland*, Case No. 1:24-cv-1218, 2025 WL 1756491, at *58 (N.D. Ohio June 24, 2025), this Court finds *Ruff v. Runyon*, 258 F.3d 498 (6th Cir. 2001), to be instructive on this fact pattern. In *Ruff*, the plaintiffs discovered, through a newspaper article in April 1994, that their indictments had been based on false information presented to the grand jury. *Ruff*, 258 F.3d at 500. A year later, in April 1995, the plaintiffs filed motions for a new trial, which the state subsequently granted. *Id.* at 499-500. Nearly another year later, on March 26, 1996, the prosecutor opted to dismiss all charges against the plaintiffs. *Id.* at 500. On August 28, 1997, the plaintiffs filed a *Bivens* action against the government employees responsible for fabricating the evidence. *Id.* at 499-500. The Sixth Circuit determined that, even though the plaintiffs had discovered the existence of the fabricated evidence in April 1994, and certainly knew of that fabricated evidence's existence by April 1995 with their motions for a new trial, "[p]laintiffs' injury—being wrongfully convicted—was . . . not known

31

until the charges against them were dismissed." *Id.* at 503. Since the plaintiffs in *Ruff* were challenging their wrongful convictions based on the fabricated evidence, the Sixth Circuit found that "plaintiffs' *Bivens* claims are analogous to a claim of malicious prosecution, and like a malicious prosecution claim, the statute does not begin to run until the charges are dismissed." *Id.* Other courts in the Sixth Circuit have since reached similar conclusions in other cases. *See Buehner*, 2025 WL 1756491, at *59 n.95 (collecting cases).

While the question of when a statute of limitations for a *Bivens* action begins to run is determined by federal law, the Court finds the Sixth Circuit's reasoning to be sufficiently analogous, and thus applicable to Plaintiff's case here. Much like the plaintiffs' *Bivens* claim in *Ruff*, the underlying criminal act (deprivation of rights through *Brady* violations) for Plaintiff's claim attacks the validity of his conviction. Plaintiff, like his counterparts in *Ruff*, may have "discovered" the relevant evidence of rights violations prior to his charges being disposed of, but Plaintiff did not know of his "injury"—being wrongfully convicted—"until the charges against [him] were dismissed." *Ruff*, 258 F.3d at 503. As discussed previously, *supra* section III.A.3.i, the reason why the accrual date is the date of dismissal, rather than the date Plaintiff was granted a new trial, is because a claim challenging the validity of a criminal conviction "will not accrue 'until the disposition of any pending criminal [proceedings].'" *Id.* at 502 (quoting *Shamaeizadeh v. Cunigan*, 182 F.3d 391, 399 (6th Cir. 1999), *abrogated on other grounds by Wallace*, 549 U.S. at 384).

### 5.  Malicious Prosecution

The Court next turns to Count Five alleging malicious prosecution.

#### i.  Timeliness

It is well established that a claim for malicious prosecution challenges the validity of a

32

conviction, meaning that it only accrues upon the termination of the underlying criminal proceedings in favor of the defendant. *See Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *see also Levering v. Nat'l Bank*, 100 N.E. 322, at paragraph 2 of the syllabus (Ohio 1912) ("The right to sue for malicious prosecution of a civil action accrues upon the rendition in the trial court of a judgment for the defendant in the action complained of[.]"). Per O.R.C. § 2305.11(A), a claim for malicious prosecution must be brought within one year of accrual. The charges against Plaintiff were dismissed with prejudice on September 22, 2023, and the Complaint was filed on September 17, 2024. The Individual Defendants concede that this analysis is correct. ECF 51 at 3.

Accordingly, the Court finds the malicious prosecution claim to be timely.

### ii. Merits

The elements required to prove malicious prosecution under Ohio law are: "(1) malice in instituting or continuing the prosecution, (2) lack of probable cause, and (3) termination of the prosecution in favor of the accused." *Froelich v. Ohio Dept. of Mental Health*, 2007-Ohio-4161, 871 N.E.2d 1159, at ¶ 10 (quoting *Trussell v. Gen. Motors Corp.*, 559 N.E.2d 733, 736 (Ohio 1990)). The Individual Defendants do not contest the third element; rather, they challenge a blend of the first two elements.[10]

Specifically, they argue that "because they did not initiate the prosecution" against Plaintiff, they cannot be held liable for malicious prosecution as "[a] prosecutor's independent charging decision typically breaks the causal chain for malicious-prosecution purposes."

---

[10] Ohio law embraces the linkage between elements one and two. "In actions for malicious prosecution, while malice is an essential element, the want of probable cause is the real gist of the action." *Melanowski v. Judy*, 131 N.E. 360, 361 (Ohio 1921). For nearly two centuries, Ohio courts have defined probable cause as a "reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves, to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Ash v. Marlow*, 20 Ohio 119, 129, 1851 WL 16, at *6 (1851). In establishing a claim for malicious prosecution, malice can be inferred if defendants "instituted or continued the prosecution" without such probable cause. *See Mayes v. City of Columbus*, 664 N.E.2d 1340, 1346 (Ohio Ct. App. 1995) ("In the absence of evidence showing a basis for the decision, it will appear to have been made without any basis, *i.e.*, maliciously." (citation omitted)).

ECF 29-1 at 11 (quoting *Novak v. City of Parma, Ohio*, 33 F.4th 296, 307 (6th Cir. 2022)). The Individual Defendants point to Plaintiff's own allegations that the Individual Defendants "presented the case to city prosecutors to seek charges[,]" which, in their view, confirms that prosecutors—not officers—made the charging decisions. *Id.* at 12 (citing ECF 5, ¶ 36(a)). "If the Individual Defendants are presenting the case to prosecutors in order to seek charges, then Individual Defendants are not making independent charging decisions." *Id.* Therefore, the claim should fail as a matter of law.

In response, Plaintiff asserts that the Individual Defendants draw unsupported conclusions from the mere fact that they presented the case to prosecutors, contending that such presentation does not necessarily absolve them of responsibility for initiating the prosecution. ECF 39 at 10. According to Plaintiff, this position oversimplifies the causal chain and ignores the well-established principle that officers can still be held liable when they provide false or misleading information that influences a prosecutor's decision to bring charges. *Id.* at 11-12.

The Individual Defendants quote *Young v. Owens*, 577 F. App'x 410, 417 (6th Cir. 2014), for the proposition that "[defendants] cannot be held liable for malicious prosecution when they did not make the decision to prosecute the plaintiff." ECF 29-1 at 11.[11] And it is true that, "[o]rdinarily, the existence of an indictment would preclude a malicious prosecution claim." *Young*, 577 F. App'x at 416; *see also* September 15, 1988 Journal Entry, Case No. CR-88-230828-ZA (Cuyahoga Cnty. C.P.) (acknowledging that Plaintiff had received a copy of the indictment against him). But the plaintiffs in *Young* failed on their malicious prosecution claim

---

[11] The Court pauses to note that, in addition to *Young*, the Individual Defendants cited to two other Sixth Circuit cases to support this proposition. See *McKinley v. City of Mansfield*, 404 F.3d 418, 444 (6th Cir. 2005); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002). All three cases that Defendants cite to were analyzing the requirements for a <u>federal</u> claim of malicious prosecution under § 1983. Nonetheless, *Young*'s clarification that officer defendants can still be liable for influencing a prosecution mirrors that of Ohio law, as discussed below.

because they were unable to point to anything in the record supporting their allegation that defendants gave false testimony to the grand jury. 577 F. App'x at 417. Further, and "[e]qually important," plaintiffs there also "fail[ed] to point to any evidence supporting their contention that the defendants *influenced or participated* in the decision to prosecute [plaintiffs]." *Id.* (emphasis added). That is not the case here.

Indeed, the Sixth Circuit, applying Ohio law, has held the exact opposite of the Individual Defendants' contention that a plaintiff's malicious prosecution claim fails as a matter of law if defendants "did not initiate the prosecution." ECF 29-1 at 11. Rather than the scope of a malicious prosecution claim being limited "solely to those who made the decision to prosecute the plaintiff . . . liability also extends to those who significantly impacted that decision." *Jones v. City of Elyria,* 947 F.3d 905, 918 (6th Cir. 2020).[12] In fact, the first element of malicious prosecution is satisfied if an officer's investigatory materials knowingly contain misstatements and falsehoods which ultimately influence the prosecutor's decision to file charges. *Id.* (citing *Ricky Jackson v. City of Cleveland*, 925 F.3d 793, 820-21 (6th Cir. 2019)); *see also Howell v. Cox*, 758 F. App'x 480, 483 (6th Cir. 2018) (collecting cases where an "intervening act of a grand jury, judge, or prosecutor did not break the causal chain" when "the decision-maker relied upon the officer's misrepresentation, omission, or other wrongdoing when making the decision that deprived the plaintiff of her liberty."). In order to break the causal chain and have the prosecutor's decision be truly independent, "the intervening act must have occurred after the defendant's conduct and must not have been reasonably foreseeable to the defendant," *Howell*, 758 F. App'x at 483.

---

[12] Although the quoted section of *Jones* references the court's analysis of plaintiff's federal malicious prosecution claim, *Jones* later explicitly applies the same analysis to their review of plaintiff's Ohio law malicious prosecution claim. *See Jones*, 947 F.3d at 921 ("As explained above, taking the facts in the light most favorable to Jones, the officers played a role in 'instituting' the prosecution despite lacking probable cause.").

The Individual Defendants also rely on *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015),[13] for the proposition that "a defendant's participation must be marked by some kind of blameworthiness, something beyond mere negligence or innocent mistake, to satisfy the elements of a malicious prosecution claim." *See* ECF 51 at 10. However, much like the plaintiffs in *Young*, the plaintiff in *Johnson* "[did] not even allege that [the domestic violence] accusations were false, much less that [defendants] participated in the prosecution in any false or misleading way." *Johnson*, 790 F.3d at 656. In dismissing the malicious prosecution claim, the court noted that "plaintiff has not alleged that either [defendant] was personally involved in the post-arrest investigation or that either of them actually 'knew' of reasons to doubt or question [the domestic violence] accusations." *Id.* at 655-56. The plaintiff did not allege that either defendant "testified for the prosecution at any stage, much less that either of them testified falsely or recklessly." *Id.* at 655. The court distinguished such "neutral participation" with the circumstances in *Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010), in which the plaintiff clearly established requisite blameworthiness by alleging how officer defendants (1) "failed to disclose key items of evidence," and (2) "made false statements [and] flagrant misrepresentations" when testifying for the prosecution. *Johnson* at 655 (citing *Sykes v. Anderson*, 625 F.3d 294, 301-02, 306-07, 311-17 (6th Cir. 2010)).

Here, Plaintiff has sufficiently alleged that the Individual Defendants "knew of reasons to doubt or question" Plaintiff's charges. As explained above, Plaintiff has alleged that the Individual Defendants are responsible for the *Brady* violations that plagued his underlying criminal case, as well as alleging that specific officers acted or testified deliberately to cover up their alleged

---

[13] It should be noted that the *Johnson* court was reviewing a district court's dismissal of a plaintiff's <u>federal</u> claim for malicious prosecution. However, as noted *supra* note 12, Ohio law claims for malicious prosecution mirror this analysis.

misconduct. Therefore, the Court declines to dismiss Count Five against the Individual Defendants.

### 6.  Abuse of Process

The Court next turns to Count Six alleging an abuse of process under Ohio law.

Plaintiff argues, in the alternative, that even "if there was probable cause and proper form supporting the criminal proceedings against Plaintiff, these proceedings were nonetheless an illegal attempt to accomplish an ulterior purpose for which they were not designed." ECF 5, ¶ 144. "Abuse of process differs from malicious prosecution in that the former connotes the use of process properly initiated for improper purposes, while the latter relates to the malicious initiation of a lawsuit which one has no reasonable chance of winning." *Robb v. Chagrin Lagoons Yacht Club*, 1996-Ohio-189, 662 N.E.2d 9, 14 (1996) (cleaned up) (quoting *Clermont Env't Reclamation Co. v. Hancock*, 474 N.E.2d 357, 362 (Ohio Ct. App. 1984)).

To succeed on an abuse of process claim under Ohio law, a plaintiff must show "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.*, 1994-Ohio-503, 626 N.E.2d 115, 118 (1994) (footnotes omitted). With respect to the second element, "the improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of the process as a threat or a club." *Robb*, 1996-Ohio-189, 662 N.E.2d at 14 (quotation omitted).

In their Motion, the Individual Defendants argue that, since Plaintiff does not allege that they intended to achieve any collateral advantage, Plaintiff's abuse of process claim fails as a

matter of law. ECF 29-1 at 14. Indeed, to survive dismissal of a malicious prosecution claim, the Sixth Circuit has held that Ohio law requires plaintiffs to plead that alleged ulterior motive or collateral advantage with at least some level of specificity. *See Hahn v. Star Bank*, 190 F.3d 708, 718 (6th Cir. 1999) (dismissing plaintiff's abuse of process claim when plaintiff "simply made conclusory allegations regarding the defendants' ulterior motives with no facts to support those contentions"). However, the Complaint only pleads a bare bones description of the alleged abuse of process. Plaintiff in his complaint states that the Individual Defendants "caused the criminal prosecution of [Plaintiff], despite knowing about evidence exculpating him, *to secure his wrongful conviction*." ECF 5, ¶ 145 (emphasis added). But "[c]ourts have rejected abuse of process claims where the allegedly 'ulterior purpose' of a criminal prosecution was simply to obtain the conviction." *Buehner*, 2025 WL 1756491 at **61-62 (collecting cases).

Perhaps most importantly, Plaintiff's Response to the Individual Defendants' Motion does not respond at all to the Individual Defendants' contention that his abuse of process claim fails for lack of a pleaded ulterior purpose or collateral advantage. *See generally* ECF 39. Under Sixth Circuit precedent, such a failure to oppose constitutes waiver. *See Humphrey v. U.S. Att'y Gen. Off.*, 279 F. App'x 328, 331 (6th Cir. 2008) ("Thus, where, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived."); *Scott v. Tennessee*, 878 F.2d 382 (Table), 1989 WL 72470, at *2 (6th Cir. 1989) (noting "if a plaintiff fails to respond or to otherwise oppose a defendant's motion, then the district court may deem the plaintiff to have waived opposition to the motion"). Having waived opposition, Plaintiff cannot now salvage this claim, and the Court therefore dismisses Count Six against the Individual Defendants.[14]

---

[14] Because the Court concludes that Plaintiff has failed to plausibly allege an abuse of process claim against the Individual Defendants, it is unnecessary to address the parties' statute of limitations arguments as to Count Six. *See*

### B. CLAIMS AGAINST THE CITY OF CLEVELAND

The Court now turns to the City's Motion.

#### 1. State Law Claims

As a preliminary matter, the Court addresses the Parties' discussion about Plaintiff's Counts Three through Six, which are all state law claims. In its motion, the City briefly addresses Plaintiff's Ohio state law claims seemingly out of an abundance of caution, noting that while it "anticipate[s] that [Plaintiff] will concede the state-law claims against Cleveland," the Complaint simply states "Defendants" without distinguishing between the Individual Defendants and the City. ECF 28-1 at 18 n.4; *see also id.* at 18-20. In his response, Plaintiff clarifies that he is only pursuing a *Monell* claim against the City, and he is not pursuing any state law claims against the City. *See* ECF 38 at 19. In light of this clarification, the Court construes Plaintiff's Complaint as not raising such claims against the City and therefore need not address the City's arguments further. This includes the City's arguments about political subdivision immunity, the statute of limitations for state law claims, and the question of punitive damages.

#### 2. *Monell* Liability[15]

The Court now turns to Count Eight alleging *Monell* liability against the City.

There are two elements to a *Monell* claim: (1) the existence of an underlying constitutional violation; and (2) a practice or custom of the City that was the moving force behind that

---

*Day v. McDonough*, 547 U.S. 198, 210 (2006) (holding that a district court has the inherent power to "determine whether the interests of justice would be better served" by addressing the merits or dismissing a petition or claim as time barred (quoting *Granberry v. Greer*, 481 U.S. 129, 136 (1987))).

[15] In addition to the four *Monell* theories of liability, the City briefly contends that Plaintiff's claim fails because there was no underlying constitutional violation, but fails to provide any substantive argument for this assertion. ECF 28-1 at 2. Plaintiff argues that this failure to argue should be construed as a failure to dispute this element, and therefore the Court should accept that Plaintiff has adequately plead the underlying constitutional violation. ECF 38 at 1. Regardless of whether or not the City intended to dispute the sufficiency of the pleading on the underlying constitutional violation, as explained at-length above, the Court concludes that Plaintiff has sufficiently alleged underlying constitutional violations caused by the Individual Defendants, and accordingly rejects the City's argument here.

constitutional violation. There are four theories of liability for proving the second element:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Kovalchuk v. City of Decherd*, 95 F.4th 1035, 1038 (6th Cir. 2024), *cert. denied*, Case No. 24-70, 145 S.Ct. 274 (Mem) (U.S. Oct. 7, 2024). The parties dispute whether Plaintiff has plausibly alleged *Monell* liability against the City under all four theories. *See generally* ECF 28-1, 38, 50. Accordingly, the Court will address each theory in-turn.

### i.    First *Monell* Theory: Official Policy

The Court begins with whether Plaintiff has sufficiently alleged the existence of an official policy that was the driving force behind the constitutional violations.

In its Motion, the City argues that Plaintiff has failed to satisfy any of the necessary elements for this theory. First, the City argues that Plaintiff has failed to identify any specific official policy. ECF 28-1 at 6-7. Second, the City asserts that Plaintiff has failed to connect any official policy to the City itself. *Id.* at 7-8. Third, the City argues that, due to the failure to identify any official policy and the failure to connect any official policy to the City, Plaintiff has failed to plausibly establish factual and proximate causation between the policy and the constitutional violation. *Id.* at 8-9. Finally, even if such a policy existed, the City argues that Plaintiff has failed to allege that such a policy was adopted with deliberate indifference.[16] *Id.* at 9.

---

[16] The City attempts to argue that Sixth Circuit precedent requires a plaintiff to "allege that the official policy was adopted with 'deliberate indifference' as to its known or obvious consequences." ECF 28-1 at 9 (citing *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)). However, as explained in the case cited by the City, the "deliberate indifference" requirement only applies if the alleged official policy is facially constitutional, but consistently implemented in such a way to result in constitutional violations, with explicit or implicit ratification by the city policymakers. *See Gregory*, 444 F.3d at 752. If the plaintiff is alleging that the policy is facially unconstitutional, they are not required to make such a showing.

Here, the City does not make any mention in its Motion about whether the alleged official policies are facially unconstitutional or facially lawful, nor does Plaintiff make any specific mention of this either. Plaintiff's allegations,

To start his response, Plaintiff discusses the historical allegations contained in his Complaint as related to the City's police, including decades-long Department of Justice investigations, third-party studies, and dozens of wrongful conviction exonerations. ECF 38 at 6-8. Plaintiff then asserts that "multiple judges of this Court and in the Sixth Circuit have approved near-identical *Monell* allegations from exonerees suing the City and its officers for similar misconduct which occurred at various points from 1974 through 2007." *Id.* at 7-8 (collecting cases). With that background, Plaintiff goes on to address the "official claim," arguing that "the City, through its police homicide division, had an unwritten decades-long official policy. . . in which police regularly used unconstitutional measures to secure wrongful convictions." *Id.* at 8 (quotation omitted). He asserts that the policy was "largely unwritten, though having the force of a rule." *Id.* at 9.

In its response, the City asserts that Plaintiff only makes broad, conclusory allegations, but fails to provide any sort of details about this alleged official policy. It argues that Plaintiff's failure to "identify which officers were subject to these policies, how the policies were communicated, [] the scope of their application . . . [and] whether the City's purported 'de facto' policy applied to all investigations, homicides or otherwise" dooms his claim under this theory. ECF 50 at 4.

An official policy claim requires the plaintiff to "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (quotation omitted), *cert. denied*, 510 U.S. 1177 (1994). Despite the City's assertions that Plaintiff was required to

---

if true, would appear to allege that any such official policy was facially unconstitutional. But even if the Court viewed Plaintiff's Complaint as challenging facially lawful policies being implemented in an unconstitutional manner, the Court finds that Plaintiff has sufficiently pled deliberate indifference to survive a Rule 12 motion. *See Buehner*, 2025 WL 1756491, at *68 n.104 (making the same findings regarding a substantively identical set of allegations in the complaint).

point to written policy records such as legislative actions, the Sixth Circuit has held that plaintiffs are only required to show "that there were 'formal rules or understandings—*often but not always committed to writing*—that [were] intended to, and [did], establish fixed plans of action to be followed under similar circumstances consistently and over time.'" *Ricky Jackson*, 925 F.3d at 829 (alterations in original) (emphasis in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)); *see also id.* at 830 ("[A] city may be liable under *Monell* for a policy of permitting constitutional violations regardless of whether the policy is written[.]"). Further, Plaintiff identifies specific elements of the alleged official policy, alleging that it included directives on "withholding, suppressing, or destroying exculpatory evidence; fabricating evidence; engaging in suggestive identification and lineup procedures; and engaging in leading, coercive, and unduly suggestive questioning of and contact with witnesses including feeding information to and threatening or bribing witnesses." ECF 5, ¶ 63. Plaintiff also pleads that "[t]he police misconduct alleged in this Complaint was undertaken pursuant to the City of Cleveland's official policies, patterns, and practices," which Plaintiff provides a fairly thorough historical overview of. *Id.*, ¶ 62; *see also generally id.*, ¶¶ 64-75. And despite the City's claim to the contrary, *see* ECF 28-1 at 8-9, Plaintiff sufficiently alleges causality between the official policy and the already-established *Brady* violations in his case.

Like many courts before this one, this Court finds that Plaintiff has sufficiently pled a *Monell* claim under an official policy theory of liability.

### ii.  Second *Monell* Theory: Ratification.

Next, the Court turns to the second *Monell* theory and whether the unconstitutional practices were ratified by a final decision-making authority.

The City begins its Motion by first arguing that Plaintiff has failed to identify a specific decisionmaker. It contends that a specific individual is necessary, otherwise the *Monell* claim would rest on impermissible *respondeat superior* grounds. ECF 28-1 at 10. In its view, Plaintiff's identification of "policymakers for the City and CDP" is too broad and fails to plausibly answer who these policymakers were, what roles they occupied, and what they were responsible for. *Id.* Further, the City argues that Plaintiff has failed to connect an official action taken by a final decisionmaker with the harm he suffered. *Id.* at 11.

In response, Plaintiff contends that identification of specific decisionmakers is not necessary when alleging, as he does, that specific CDP homicide detectives were given *de facto* final authority when they were delegated "massive authority" to approve each other's unconstitutional actions. ECF 38 at 13. Additionally, Plaintiff argues that the City ratified the unconstitutional actions by failing to meaningfully investigate and punish allegations of misconduct. *Id.* Under these two approaches, Plaintiff avers that he has also sufficiently alleged causation between the ratification and the unconstitutional actions at issue; he cannot get any more specific, he says, without discovery. *Id.* at 15.

In its Reply, the City reiterates that Plaintiff's failure to identify specific final policymakers dooms his case, as well as Plaintiff's failure "to allege a pattern of similar failures to investigate." ECF 50 at 6. Finally, the City argues that Plaintiff's theory of "massive authority" leading to effective ratification "rests on a fundamental misreading of *Monell* and its progeny." *Id.*

At the outset, it is important to recognize that "[a] municipality may not be held liable

under § 1983 on a *respondeat superior* theory—in other words, '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (emphasis in original) (quoting *Monell*, 436 U.S. at 691). However, this is not the same as requiring a plaintiff to identify specific individuals who ratified the unconstitutional misconduct. Rather, "[a] plaintiff can establish municipal liability by showing that the municipality ratifies the unconstitutional acts of its employees by failing to meaningfully investigate and punish allegations of unconstitutional conduct." *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020) (citing *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247-48 (6th Cir. 1990)).

Further, "the Sixth Circuit recognizes that, in certain circumstances, police officers may have final, unreviewable authority to act, effectively, as a final policymaker unconstrained by the official policies of superiors." *Charles Jackson v. City of Cleveland*, 622 F. Supp. 3d 636, 643 (N.D. Ohio 2022) (citing *Monistere v. City of Memphis*, 115 F. App'x 845, 852 (6th Cir. 2004)). Indeed, the court in *Charles Jackson* held that the plaintiff alleging this "longstanding policy of massive power delegated to subordinate officers, including policing at the individual level[,]" was sufficient for a claim under the *Monell* ratification theory to survive at the pleading stage. *Id.* (quotation omitted).

The Court finds that Plaintiff has sufficiently plead a ratification theory, although just barely in the Court's opinion. In the Complaint, Plaintiff alleged that "the City and CPD have a[n] [] entrenched history of failing to supervise, investigate, and discipline allegations of officer misconduct like that at issue here." ECF 5, ¶ 76. He alleged that

> City policy makers and CDP supervisors facilitated a code of silence within the CDP. In accordance with this code, police department detectives refused to report, and otherwise lied about, misconduct committed by their colleagues, including the misconduct at issue in this case. The City of Cleveland's training, supervisory, and disciplinary practices supported this code of silence, by protecting

> from discipline officers who engaged in misconduct and teaching
> police officers that they must abide by the code.

*Id.*, ¶ 82. Plaintiff goes on to allege that, as a result of this code of silence and failure to investigate and discipline, "CDP officers came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of consequences from their leadership or the City," and specifically "caused the [Individual] Defendants to believe that they could abuse [Plaintiff's] rights and cover up what they did without fear of discipline." *Id.*, ¶¶ 83, 88.

Viewing these allegations in their totality, and with the presumption of truth afforded to them at this stage in the proceeding, the Court accordingly declines to dismiss Plaintiff's *Monell* claim under a theory of ratification.

### iii.  Third *Monell* Theory: Failure to Train and Discipline.

Next, the Court looks at the third *Monell* theory and whether there was inadequate training or supervision.

In its Motion, the City argues that Plaintiff failed to allege that any training was inadequate, and specifically no allegations about the substance of that allegedly inadequate training (rather than its form). ECF 28-1 at 12. To the extent Plaintiff did allege any sort of inadequate training, the City asserts that Plaintiff failed to alleged that the inadequacy was the result of "deliberate indifference" nor did he allege that the City was "on notice" of any allegedly deficient training. *Id.* at 13. Finally, the City argues that, notwithstanding Plaintiff's failure to sufficiently allege the previous elements of this theory, Plaintiff also failed to allege causation between the inadequate training and the unconstitutional misconduct at issue in his case. *Id.* at 14.

In his Response, Plaintiff avers that he did plausibly allege a theory of inadequate training. He cites to portions of the Complaint where he discussed, for example, "how CPD failures of

training and oversight were passed down between specific supervising officers within the homicide division" and provided "specific exemplary evidence and prior cases demonstrating how the City was on notice of the defects in its training program and the outcomes of its code of silence but failed to remedy the same." *See* ECF 28 at 16 (citing, *inter alia*, ECF 5, ¶¶ 66, 71-75, 81-82). As to the deliberate indifference element, Plaintiff notes that notice of a pattern of misconduct is only one way to satisfy this element, and while he asserts that he has done that sufficiently, Plaintiff notes that he can also allege that "that the training defects were obvious, or that the constitutional violations that resulted were foreseeable." *Id.* at 17 (citing *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)).

In its Reply, the City focuses on Plaintiff's alleged failure to sufficiently plead deliberate indifference. It asserts that "[a] handful of isolated or subsequent cases does not suffice." ECF 50 at 10. Moreover, the City argues that, once the cases that post-date the 1987-88 investigation in this case are excluded, only two sufficiently similar cases are left. *Id.* at 13. The City similarly disputes the applicability of the Complaint's references to testimony in other cases and historical records and reports. *Id.* at 13-14. Therefore, the City argues, Plaintiff has failed to plead sufficient facts that the City was on notice of misconduct such as to constitute deliberate indifference.

To succeed under the third *Monell* theory for failure to train or inadequate training, "a plaintiff 'must establish that: 1) the City's training program was inadequate for the tasks that officers must perform; 2) the inadequacy was the result of the City's deliberate indifference; and 3) the inadequacy was closely related to or actually caused the injury.'" *Ricky Jackson*, 925 F.3d at 834 (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006)). "When determining whether a municipality has adequately trained its employees, 'the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.'" *Id.* (quoting

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

In his Complaint, Plaintiff alleged that there was an "established practice of failing to identify, investigate, supervise, or discipline police officers who were repeatedly accused of the serious misconduct, failing to investigate *Brady* violations and other wrongful conviction problems, and facilitating a code of silence within the CDP." ECF 5, ¶ 83. He further alleged that

> Policymakers for the City on matters relating to the CDP knew, among other things, that there was a need to implement policies and train, supervise, and discipline police officers related to how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct interrogations and witness interviews, how to conduct identifications or lineups or showups, how to conduct arrests, how to write police reports or notes of witness statements and evidence, and how not to conduct unduly suggestive identifications or interrogations.

*Id.*, ¶ 86. In spite of this knowledge, Plaintiff alleges that "[t]he City and CDP decided not to implement any legitimate mechanism for oversight or punishment of officers who violated their Brady obligations or peoples' constitutional rights, or who fabricated evidence or fed information to witnesses or used suggestive identification procedures or coerced or intimidated witnesses." *Id.* With such an entrenched and widespread practice, the misconduct against Plaintiff and "constitutional violations alleged herein were a predictable consequence" of this inadequate training. *Id.*, ¶ 87. These allegations, in their totality, are sufficient to survive a Rule 12 motion.

Moreover, the Court is not persuaded by the City's arguments that the Complaint's references to other cases and historical records are either inapposite or irrelevant. Indeed, the City correctly notes that

> [o]n a Rule 12 motion, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). In addition, "a court may take judicial notice of other court proceedings without converting the

47

> motion into one for summary judgment." *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010).

ECF 50 at 12 n.4. However, other cases and instances of alleged and proven misconduct do not need to be identical to the alleged misconduct in the instant proceeding in order to establish sufficient notice. *See Young v. Kent Cnty. Sheriff's Dept.*, Case No. 21-1222, 2022 WL 94990, at *5 (6th Cir. Jan. 10, 2022) ("A case does not need to be 'directly on point,' with identical facts to put defendants on notice." (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))). In his Complaint, Plaintiff provides more than ample evidence to suggest that, by the time of the investigation in 1987-88, the City and CPD were at least on constructive notice current training was inadequate.

Accordingly, the Court declines to dismiss Plaintiff's *Monell* claim under a theory of inadequate training or failure to train.

### iv. Fourth *Monell* Theory: Custom of Tolerance or Indifference.

Finally the Court turns to the fourth *Monell* theory and whether there was a custom of tolerance or indifference towards unconstitutional misconduct.

In its Motion, the City argues that Plaintiff failed to allege "a clear and consistent pattern of illegal activity," which the City asserts is the requisite standard under Sixth Circuit precedent. ECF 28-1 at 15. As similarly argued with regard to notice under a failure to train theory, the City again notes that contemporaneous or subsequent conduct cannot establish a pattern of violations that would put the City on notice for the purposes of *Monell*. The City argues that, to the extent there might have been a pattern, Plaintiff failed to allege that the City actually knew of this pattern. *Id.* at 16. The City also reiterates its previous arguments about deliberate indifference and a lack of causality. *Id.* at 17-18.

In response, Plaintiff notes that he described in detail several decades-worth of misconduct

sufficiently similar to the alleged misconduct in his own case. ECF 38 at 18. He reiterates his previous counterarguments in response to the City's repeated arguments regarding notice, deliberate indifference, and causation. *Id.* at 19. Plaintiff specifically pushes back on the City's assertion that he failed to plead a sufficient number of examples of prior similar misconduct to make out a custom claim, emphasizing that "[n]either the Sixth Circuit nor any court has determined that there is a numeric threshold of prior similar conduct under which a *Monell* custom claim falls short of Rule 12." *Id.*

In its Reply, the City reiterates many of the same arguments it previously made made regarding patterns of prior misconduct, deliberate indifference, and causation. ECF 50 at 11-14. The City also argues that many of Plaintiff's examples of misconduct post-date his investigation and conviction, and therefore cannot serve as notice. *Id.*

In order to succeed on a *Monell* custom claim, a plaintiff must demonstrate

> (1) the existence of a clear and persistent pattern of [illegal activity];
> (2) notice or constructive notice on the part of the [municipality];
> (3) the [municipality's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation.

*Stewart v. City of Memphis*, 788 F. App'x 341, 346-47 (6th Cir. 2019) (alterations in original) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

At the outset, the Court agrees with the City that "subsequent conduct cannot establish a pattern of violations that would provide notice to the municipality and the opportunity to conform to constitutional dictate." ECF 28-1 at 15 (cleaned up) (quoting *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019)). Accordingly, the Court will give no weight to any misconduct alleged to have occurred following Plaintiff's wrongful conviction for purposes of placing the City on notice.

Despite this, the Court finds that Plaintiff has sufficiently plead a *Monell* custom theory. In his Complaint, Plaintiff describes at least two decades' worth of similar misconduct prior to his own wrongful incarceration. *See generally* ECF 5, ¶¶ 62-92. This includes multiple other cases of wrongful incarceration involving allegations of *Brady* violations and other misconduct. It also includes references to contemporaneous reports and studies detailing how "[t]he problems of police and community relations are so critical in Cleveland that they warrant immediate and serious attention leading to the adoption of new concepts, policies, programs, and procedures." *Id.*, ¶ 74 (quoting Mayor's Crime Commission, <u>Report with Recommendations</u>, app. B at 23 (1974)). As previously noted, the misconduct need not be identical in order to suffice for providing notice.

Relatedly, the Court rejects the City's argument that, as a matter of law, Plaintiff has pled an insufficient number of incidents. *See* ECF 28-1 at 15-16. Even assuming for the sake of argument that the City's analysis is correct and Plaintiff has only "plausibly allege[d] . . . at most . . . two incidents between the 1960s and 1987," the City is unable to cite any case law supporting its proposition that two incidents in a twenty-seven year period is facially insufficient. *Id.* at 16. Indeed, this is because no such case law exists. Instead, the City can only cite to other cases where, after a fact-specific analysis, the court determined that the plaintiff had not demonstrated that the few cited incidents established a pattern—not that, as a matter of law, those incidents were plainly insufficient to establish a pattern. *See Buehner*, 2025 WL 1756491, at *73 & n.112 (rejecting the same argument and admonishing the City for similarly misconstruing case law to inappropriately suggest only two incidents over a ten-year period was not a pattern as a matter of law). There is no mathematical formula that there must be a minimum number of incidents in a certain time frame. Whether Plaintiff is ultimately able to establish a pattern remains to be seen. But even if the City is correct that there are only two relevant instances in a ten-year period (which Plaintiff disputes),

it is not established as a matter of law that this is plainly insufficient to establish a pattern.

It is certainly possible that, after further discovery, Plaintiff is unable to establish a pattern or custom; however, the law does not require Plaintiff to prove a minimum number of instances in a certain time frame.

For the reasons previously stated, *see supra* Sections III.B.2.i-iii, the Court also finds that Plaintiff has sufficiently pled notice, deliberate indifference, and causation.

Accordingly, the Court declines to dismiss Plaintiff's *Monell* custom claim.

## IV. CONCLUSION

For these reasons, the Court: (1) **DENIES** the City's Motion; (2) **GRANTS IN PART** the Individual Defendants' Motion as it relates to any federal and state law claims for monetary judgment against the Tolliver Estate, as well as the abuse of process claim against all Individual Defendants; and (3) **DENIES IN PART** the Individual Defendants' Motion regarding any federal and state law claims for declaratory judgment against the Tolliver Estate, as well as the remaining state law claims against the Individual Defendants.

**IT IS SO ORDERED.**

Dated: August 19, 2025                    */s/ Dan Aaron Polster*
                                          **Dan Aaron Polster**
                                          **United States District Judge**

51